# IN THE SUPREME COURT OF IOWA

No. 18–0294

Filed January 10, 2020

**STATE OF IOWA,**

  Appellee,

vs.

**EARNEST BYNUM,**

  Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Nicholas Scott, District Associate Judge.

A defendant appeals his conviction for falsely reporting a criminal act. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, Jerry Vander Sanden, County Attorney, and Monica C. Slaughter, Assistant County Attorney, for appellee.

**CHRISTENSEN, Justice.**

We are asked to determine whether the false report of a criminal act requires definitional instructions for an affirmative defense to the underlying criminal act. After closing arguments, the defendant requested the district court provide an instruction on the exceptions to the underlying criminal act of carrying weapons. The district court denied the defendant's request. The defendant was then convicted of making a false report alleging the occurrence of the criminal act of carrying weapons.

On direct appeal, the defendant raised numerous issues. The court of appeals affirmed the defendant's conviction. We granted the defendant's application for further review. We exercise our discretion and only address whether the definitional instructions to the criminal act of carrying weapons required inclusion of the statutory exceptions. Upon our review, we conclude substantial evidence did not support the defendant's requested instruction on his hypothetical affirmative defense, and we affirm the decision of the court of appeals and judgment of the district court.

**I. Background Facts and Proceedings.**

The Cedar Rapids Police Department received a call on its nonemergency number from an unidentified caller. It was 10:17 p.m. on March 10, 2016, when the caller reported he witnessed a gray Chevrolet Suburban double park across the sidewalk of a Cedar Rapids home. Two males, one carrying a handgun and one carrying a rifle, then exited the Suburban and walked up to the house's front door. According to the caller, the individuals knocked on the front door and entered the house. The caller reportedly did not know who lived at the house and had not previously noticed the Suburban parked there. The unidentified caller did

not want to reveal his name, but he did provide Cedar Rapids police with his phone number.

That same evening, prior to this report, Pamela Haskins was at her Cedar Rapids home. Haskins was with her youngest son, Tamir; her oldest son, Bilal; her granddaughter; and her friend, Judy. Haskins owned a Chevrolet Suburban, which Bilal used as his primary vehicle. That evening, Bilal drove himself and his daughter to Haskins's home. Approximately one hour after Bilal and his daughter arrived, Tamir planned to drive Judy back to her home. When the group stepped out on the front porch, they faced spotlights, police officers with drawn weapons, and orders to put their hands up.

Tamir was ordered to step off the porch with hands in the air and to walk backwards towards the officers. He was placed on his knees and handcuffed. Each individual was then ordered off the porch. Because Haskins's granddaughter remained in Bilal's arms, he was not ordered to the ground. The officers entered Haskins's home, indicating they were searching for guns. Haskins replied that she did not own any guns, and no guns were found in her house.

Officer Shannon Aguero of the Cedar Rapids Police Department explained to Haskins the department was acting on a call reporting two men with guns at her address. Officer Aguero showed Haskins the number of the unidentified caller; Haskins immediately recognized the number as belonging to Earnest Bynum.

Haskins and Bynum knew each other for years. Bynum was Haskins's on-again, off-again boyfriend who lived with Haskins and their son. Haskins also has two older sons, whom Bynum knew. One day prior to the March 10 unidentified caller report, Haskins and Bynum had a disagreement that resulted in Bynum shoving Haskins against the wall.

Haskins called the Cedar Rapids Police Department to report the domestic assault that day.

Officer Aguero made contact with Bynum on March 24. During the interview, Bynum initially denied any knowledge of the phone call, but he later admitted to making the call on the nonemergency line. Bynum indicated to Officer Aguero that he was near Haskins's home when he saw a gray Suburban with a male occupant wave a gun in his direction. Bynum stated he identified the occupant waiving the gun as Haskins's son, Bilal. When Officer Aguero asked Bynum why he did not call in the report at the location it happened, Bynum said that he knew where the vehicle was going and that the occupants were associated with Haskins's home. Bynum stated he called in the report as if it happened at Haskins's home and then proceeded to follow the Suburban to the location he reported. Bynum did not provide the identity of Haskins's son during his call because he did not want to get anyone in trouble and he did not want to be a snitch.

The State charged Bynum with the crime of false reports. False reports, as outlined in Iowa Code chapter 718, is an offense against the government and it states,

> A person who reports or causes to be reported false information to a fire department, a law enforcement authority, or other public safety entity, knowing that the information is false, or who reports the alleged occurrence of a criminal act knowing the act did not occur, commits a simple misdemeanor, unless the alleged criminal act reported is a serious or aggravated misdemeanor or felony, in which case the person commits a serious misdemeanor.

Iowa Code § 718.6(1) (2016). Bynum's trial information was later amended, indicating the underlying criminal act Bynum falsely reported was carrying weapons (Iowa Code section 724.4), burglary (Iowa Code section 713.1), or going armed with intent (Iowa Code section 708.8).

This matter proceeded to trial on January 8, 2018. Bynum presented scant evidence concerning the exceptions to carrying weapons. After closing arguments, Bynum requested the jury instructions include the exceptions[1] to the underlying criminal act of carrying weapons. When asked by the district court to specify which exception, Bynum requested the court include possession of a legally issued permit. The district court denied Bynum's request. It indicated the definition of carrying weapons was sufficient and that, in the case of a false report, Bynum would not know whether the exception applied at the time of his report. The district court then instructed the jury, in part, as follows:

**JURY INSTRUCTION NO. 13**

The State must prove . . . the following elements of False Reports:

1. On or about the March 10, 2016, the defendant reported information to law enforcement authority concerning the alleged occurrence of a criminal act.

2. When reporting the alleged criminal act the defendant knew, as defined in Instruction 18,[2] the information was false.

3. The defendant reported the crime of Carrying Weapons, Burglary, or Going Armed with Intent.

If the State has proved all of the elements, the defendant is guilty of False Reports alleging the crime of Carrying Weapons, Burglary, or Going Armed with Intent. If only the first two elements are met then the defendant is guilty of False Reports. If the State has failed to prove either of the first two elements, the defendant if not guilty.

**JURY INSTRUCTION NO. 14**

Carrying Weapons is defined as: A person who goes armed with a firearm concealed on or about the person, or who,

---

[1]There are eleven exceptions to the criminal act of carrying weapons enumerated in subsections (*a*)–(*k*) of Iowa Code section 724.4(4).

[2]Jury Instruction No. 18 stated, "For the defendant to know something means he or she had a conscious awareness that the information was false."

within the limits of any city, goes armed with a pistol or revolver, or any loaded firearm of any kind, whether concealed or not, or who knowingly carries or transports in a vehicle a pistol or revolver.

. . . .

**JURY INSTRUCTION NO. 17**

It is not necessary for the State to prove all the elements beyond a reasonable doubt for the crimes of Carrying Weapons, Burglary, or Going Armed with Intent.

The matter was submitted to the jury for deliberations. The jury returned a verdict finding Bynum guilty of falsely reporting the alleged criminal act of carrying weapons. Judgment finding Bynum guilty of this offense was entered, and the district court sentenced Bynum to 365 days in jail, with all but fourteen days suspended.

Bynum appealed his judgment and sentence arguing, among other things, "The jury should have been instructed not to presume that a person who is seen in public in possession of a firearm is committing a crime."[3] We transferred the case to the court of appeals, and the district court's judgment was affirmed. Regarding the jury instruction issue, the court of appeals concluded the district court did not err in failing to give Bynum's requested instruction because it addressed a statutory exception rather than an element of the underlying crime.

We granted Bynum's application for further review.

**II. Error Preservation.**

Bynum presents two arguments regarding exceptions to the underlying criminal act of carrying weapons. First, Bynum argues the district court erred as a matter of law when it refused to provide his requested instruction. That argument was preserved when it was raised

---

[3]On direct appeal, Bynum also asserted that he was denied an impartial jury of his peers and that the district court abused its discretion in allowing the admission of prior-bad-acts evidence and photographs of the firearms used during the police response.

and decided by the district court. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012). Second, Bynum argues the failure to provide his requested instruction "violated his right to a fair trial and due process of law." The State argues Bynum did not preserve a due process or other constitutional claim. We agree. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we decide them on appeal." *Id.* (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). This doctrine applies with equal force to constitutional issues. *See Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."); *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002) (noting error preservation rule "applies with equal strength to constitutional issues"); *Garwick v. Iowa Dep't of Transp.*, 611 N.W.2d 286, 288 (Iowa 2000) (en banc) ("Issues not raised before the district court, including constitutional issues, cannot be raised for the first time on appeal." (quoting *State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997))). Bynum did not raise his constitutional argument during the jury instruction discussion or by motion, and it does not appear the district court considered that argument. *See Stammeyer v. Div. of Narcotics Enf't*, 721 N.W.2d 541, 548 (Iowa 2006) ("If the court does not rule on an issue and neither party files a motion requesting the district court to do so, there is nothing before us to review."). Because Bynum's constitutional arguments were not preserved for our review, we restrict our discussion to his first argument: whether the district court erroneously refused to provide his requested instruction.

### III. Standard of Review.

"We have the discretion, when we grant a further review application, to review any issue raised on appeal." *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019); *see State v. Effler*, 769 N.W.2d 880, 883 (Iowa 2009) ("[E]fficient use of judicial resources will sometimes prompt our court to rely on the disposition made by the court of appeals on some issues and address only those issues that merit additional consideration."). We exercise that discretion here and only address the issue of whether the district court erred by refusing Bynum's requested instruction. Thus, the court of appeals decision will stand as the final decision for the remaining issues. *See Lorenzo Baltazar*, 935 N.W.2d at 868.

"We review challenges to jury instructions for correction of errors at law." *See State v. Guerrero Cordero*, 861 N.W.2d 253, 257–58 (Iowa 2015), *overruled in part by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707–08, 708 n.3 (Iowa 2016); *see also* Iowa R. App. P. 6.907 ("Review in equity cases shall be de novo. In all other cases, the appellate courts shall constitute courts for correction of errors at law . . . ."). "[W]e generally review a district court's refusal to give a requested jury instruction for errors at law; however, if the jury instruction is not required but discretionary, we review for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017).

### IV. Analysis.

Iowa Code section 718.6(1) punishes the conduct of a person "who take[s] affirmative steps to convey false information to law enforcement authorities." *State v. Ahitow*, 544 N.W.2d 270, 274 (Iowa 1996). If a person knowingly reports false information to law enforcement authorities, that person commits a simple misdemeanor. Iowa Code § 718.6(1).

Likewise, a person who reports the alleged occurrence of a criminal act, knowing the criminal act did not occur, also commits a simple misdemeanor. *Id.* However, if the criminal act falsely reported is a serious misdemeanor, aggravated misdemeanor, or felony, that person commits a serious misdemeanor. *Id.*

The jury convicted Bynum of falsely reporting the alleged criminal act of carrying weapons. A person convicted of carrying weapons commits an aggravated misdemeanor. *Id.* § 724.4(1). Because the jury found Bynum guilty of falsely reporting a criminal act classified as an aggravated misdemeanor, his conviction under the false-reports provision was a serious misdemeanor. *See id.* § 718.6(1).

> The crime of carrying weapons is defined as,
>
> Except as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person, or who, within the limits of any city, goes armed with a pistol or revolver, or any loaded firearm of any kind, whether concealed or not, or who knowingly carries or transports in a vehicle a pistol or revolver, commits an aggravated misdemeanor.

*Id.* § 724.4(1). This section further indicates the prohibition against carrying weapons does not apply in certain circumstances and lists eleven exceptions. *See id.* § 724.4(4)(*a*)–(*k*).

Jury Instruction No. 14 set forth the definition for carrying weapons, but it did not include any of the statutory exceptions. Bynum's counsel, noting the omission, raised the issue before the district court:

> Instruction Number 14, which is the definitional instruction for Carrying Weapons, I failed to realize earlier that it does not include any exceptions basically. That it essentially says that anyone within city limits that has a firearm is committing Carrying Weapons. And obviously we all know that is not accurate in that there are exceptions, primarily there's an exception for anyone who possesses a legally-issued permit to carry such firearms. So I would request the Court amend that instruction if that's even possible.

One of the requested statutory exceptions states the crime of carrying weapons does not apply if,

> A person who has in the person's possession and who displays to a peace officer on demand a *valid permit* to carry weapons which has been issued to the person, and whose conduct is within the limits of that permit. A person shall not be convicted of a violation of this section if the person produces at the person's trial a permit to carry weapons which was valid at the time of the alleged offense and which would have brought the person's conduct within this exception if the permit had been produced at the time of the alleged offense.

*Id.* § 724.4(4)(*i*) (emphasis added). The district court declined to add Bynum's requested exception to the jury instruction, finding the instructional definition of carrying weapons sufficient. The issue presented is whether the district court erred in denying Bynum's requested exception.

Bynum contends providing the definition of carrying weapons, without the statutory exceptions for possessing a permit, deprived the jury of its ability to evaluate whether he falsely reported the underlying criminal act of carrying weapons. Essentially, Bynum argues leaving out an instruction on his theory of defense—that carrying weapons is not inherently a crime—effectively directed his verdict of guilt.

As a threshold matter, we cannot agree with Bynum that the existence of one or more possible legal exceptions to the underlying criminal act means he did not falsely report the alleged occurrence of a criminal act. Courts in other jurisdictions addressing the same issue have determined the existence of a potential defense to the underlying criminal act does not decriminalize the charged offense of falsely reporting a crime.

A Virginia court considered the argument that a defendant, convicted of making a false accusation of inappropriate touching against a police officer, did not allege the commission of any crime because there

could have been potential defenses such as consent to the hypothetical crime. *Dunne v. Commonwealth*, 782 S.E.2d 170, 173 (Va. Ct. App. 2016). Virginia's false-reporting provision made it "unlawful for any person . . . to knowingly give a false report as to the commission of any crime to any law-enforcement official with intent to mislead." *Id.* at 172 (quoting Va. Code Ann. § 18.2-461). The court indicated this provision did not require "that such false report lead to the filing of a false charge, much less result in a false conviction." *Id.* at 173. It explained Virginia's provision criminalized the false report of a crime, not proof of each element of the underlying crime beyond a reasonable doubt. *Id.* "That [defendant's] false report of a crime might leave open hypothetical defenses to such falsely reported crime does not excuse or decriminalize her lie." *Id.*

In *Commonwealth v. Dahdah*, the Appeals Court of Massachusetts reached a similar conclusion about whether the existence of hypothetical defenses would undermine a conviction for "intentionally and knowingly" making a "false report of a crime." No. 12–P–1670, 2014 WL 470358, at *2 (Mass. App. Ct. Feb. 7, 2014) (unpublished opinion) (quoting Mass. Gen. Laws ch. 269, § 13A). The defendant there was a customer in a fast-food restaurant who created a disturbance. *Id.* at *1. The court considered the defendant's argument that his false report—that a restaurant manager "grabbed him and twisted his arm"—was not a false report of a crime because the manager had a privilege to remove him and thus "the statements he made to police, even if false, did not amount to a crime." *Id.* at *1–2. In rejecting the defendant's argument, the appeals court explained,

> He posits that in the context of this case, the accusation that the manager grabbed him and twisted his arm does not allege a criminal act because the manager had a privilege to remove him by reasonable force.

> This argument is without merit. As a threshold matter, it ignores that even a legitimate defense does not preclude the filing of a criminal charge by complaint or indictment. It is axiomatic that if a victim makes a minimally credible claim that a criminal act has occurred, the defendant has a right to assert the defense at trial but no right to preempt the charge.

*Id.* at *2.

Another court interpreted a false-report statute to apply where one lies about details concerning a crime. *See People v. Chavis*, 658 N.W.2d 469, 474 (Mich. 2003). There, the defendant argued his false statement concerning the commission of an actual crime did not pertain to whether a crime had occurred. *Id.* at 472. The court explained, "[T]he plain language of the statute is not limited to only those situations where no crime *has been committed*; it also applies where one reports false details about the crime." *Id.* at 473.

We agree with the authority holding that a potential defense to the underlying criminal act does not absolve responsibility from the charged offense of false reports. It is not the jury's role to decide the law. *See People v. Whitaker*, No. 343988, 2019 WL 1746335, at *2 (Mich. Ct. App. Apr. 18, 2019) (unpublished opinion) (per curiam) (holding that in a false reporting of a crime case, the jury should not be asked to determine whether or not the crime reported was a felony). There is sufficient evidence of guilt if the defendant falsely reports conduct that would establish the prima facie elements of a crime. However, this is not dispositive of the issue raised here. We still must address whether Bynum was entitled to an instruction on his theory of defense—the existence of statutory exceptions.

The rules governing jury instructions in civil cases apply to trials in criminal cases. Iowa R. Crim. P. 2.19(5)(*f*); *State v. Marin*, 788 N.W.2d 833, 837 (Iowa 2010), *overruled on other grounds by Alcala*, 880 N.W.2d at 707–

08, 708 n.3. "Consequently, the court is required to 'instruct the jury as to the law applicable to all material issues in the case . . . .' " *Marin*, 788 N.W.2d at 837 (quoting Iowa R. Civ. P. 1.924). While the instruction given need not "contain or mirror the precise language of the applicable statute, [the instruction] must be a correct statement of the law." *State v. Schuler*, 774 N.W.2d 294, 298 (Iowa 2009). If a defendant's theory of defense is timely requested, is supported by the evidence, and is a correct statement of the law, the district court must provide the requested instruction. *See Guerrero Cordero*, 861 N.W.2d at 260. Evidence in support of an instruction must be substantial. *State v. Ross*, 573 N.W.2d 906, 913 (Iowa 1998). "An instruction is supported by the evidence when it 'could convince a rational finder of fact that the defendant has established his affirmative defense.' " *Guerrero Cordero*, 861 N.W.2d at 260 (quoting *State v. Broughton*, 425 N.W.2d 48, 52 (Iowa 1988)).

The distinction between an element of a crime and an affirmative defense is significant. *See State v. Delay*, 320 N.W.2d 831, 834 (Iowa 1982). For an element of the crime, the state bears the burden of production and persuasion. *State v. Moorhead*, 308 N.W.2d 60, 62 (Iowa 1981) (en banc). In contrast, the defendant must go forward "with evidence of an affirmative defense." *Delay*, 320 N.W.2d at 834. Thus, the defendant must produce sufficient evidence to show the exception is applicable. *See Moorhead*, 308 N.W.2d at 62–63.

This court has held the absence of a permit is not an element of the criminal act of carrying weapons. *State v. Bowdry*, 337 N.W.2d 216, 218 (Iowa 1983). The question presented in *Bowdry* was whether the state had the initial burden of proving Bowdry did not have a permit to carry or transport a weapon. *Id.* at 217.

Bowdry was arrested and tried for carrying a weapon in his car. *Id.* At trial, "[t]he State did not introduce evidence that Bowdry did not have a permit" or that the officer asked Bowdry to produce a permit. *Id.* The precise question in *Bowdry* was "whether the absence of a permit is or is not an element of the offense itself which the State must initially prove under *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed.2d 368, 375 (1970)." *Id.* at 218. We noted prior Iowa law provided, "No person shall carry a pistol or revolver concealed on or about his person or whether concealed or otherwise in any vehicle occupied by him . . . without a permit therefor as herein provided." *Id.* at 217 (quoting Iowa Code § 695.2 (1977) (repealed Jan. 1, 1978)). Under the prior version, the burden was on the state to prove absence of a permit. *Id.* at 218. However, under the modern version applicable in Bowdry's case, we concluded the legislature's structural change to the statute "did not intend to make the absence of a permit an element of the offense." *Id.* We further explained,

> In the initial paragraph of new section 724.4, defining the crime, the drafters did not include the language, "without a permit . . . ." Instead, they added a proviso that the section should not apply in eight situations which they then listed. One of the situations involves the permit issue. Our first reaction to the section is that the Assembly probably did not intend the State must initially negate the several exceptions in every prosecution under section 724.4. *Cf. State v. Delay* at 834 ("It is unreasonable to think that the legislature intended to place upon the State the burden of laboriously disproving each of those forms of justification in every prosecution for assault, no matter how unrelated to the facts of the case they may be.").

*Id.* In Bowdry's case, where no permit was produced at the scene or at the trial, the issue of the permit was not in the case unless substantial evidence appeared in the record, either from the state or from Bowdry, that he had a valid permit at the time. *Id.* 218–19.

Two years later, we made clear the statutory exceptions provided in section 724.4 "are affirmative defenses," *State v. Erickson,* 362 N.W.2d 528, 531 (Iowa 1985) (citing *Bowdry,* 337 N.W.2d at 218), and "[t]he State need not negate the exception unless substantial evidence is produced from some source that the exception applies," *State v. Leisinger,* 364 N.W.2d 200, 202 (Iowa 1985) (citing *Bowdry,* 337 N.W.2d at 218; *State v. Wilt,* 333 N.W.2d 457, 461 (Iowa 1983); *Delay,* 320 N.W.2d at 834; *State v. Boland,* 309 N.W.2d 438, 440 (Iowa 1981)).

The rule expressed in *Bowdry* and then reiterated in *Erickson* applies to Bynum's case. Bynum's requested exception, a valid permit, is not an element of the carrying-weapons offense. *See* Iowa Code § 724.4(1) (2016) (defining the criminal act of carrying weapons); *Erickson,* 362 N.W.2d at 531 (stating exceptions to carrying weapons are affirmative defenses). Therefore, the State is not required to prove the absence of that exception. *See Leisinger,* 364 N.W.2d at 202; *Delay,* 320 N.W.2d at 834. If Bynum's theory of defense on the underlying falsely reported crime is the existence of a valid permit, he must convince a rational finder of fact that he has established his affirmative defense before the district court will give the requested jury instruction. *See Guerrero Cordero,* 861 N.W.2d at 260.

In this case, Bynum did not produce any evidence, let alone substantial evidence, to support his legal theory concerning the existence of a permit. Bynum points to nothing in the record suggesting that when he made his false report he said the two men had or might have permits to carry their weapons. Bynum does point to the testimony of the responding officer to support his contention that possession of a firearm is not inherently illegal. *See Bowdry,* 337 N.W.2d at 218 (stating a defendant may rely on the state's case for substantial evidence of the

existence of a valid permit). The cross-examination by defense counsel elicited the following:

> Q. And, Officer, would you agree it isn't necessarily illegal for someone to possess a handgun or a rifle? A. No, it's not.

> Q. And, in fact, would you agree that there are probably hundreds of thousands of Iowans who possess licenses allowing them to carry firearms? A. Yes.

Based on our review of the entire record, this is the only evidence to support Bynum's theory the reported individuals possessed valid permits—an exception to carrying weapons. However, the officer's broad statements do not concern the individuals Bynum reported. We conclude the evidence is insufficient to support Bynum's requested jury instruction. A rational finder of fact could not be convinced the evidence established Bynum reported individuals carrying weapons who possessed valid permits. *See Guerrero Cordero*, 861 N.W.2d at 260. Because the evidence does not support Bynum's affirmative-defense exception to carrying weapons, the district court was not required to instruct the jury on this theory. *See Marin*, 788 N.W.2d at 837. Therefore, the district court's refusal to give Bynum's requested instruction was not erroneous.

## V. Conclusion.

We affirm the judgment of the district court and the court of appeals decision addressing Bynum's requested instruction. The court of appeals decision for the remaining issues stands as the final decision.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Appel, J., and Wiggins, C.J., who dissent.

**APPEL, Justice (dissenting).**

The majority expresses its disapproval of the conduct of Earnest Bynum by affirming his conviction of falsely reporting a criminal act under Iowa Code section 718.6 (2016). While there is no doubt that Bynum is guilty of making a false report, the question of whether Bynum is guilty of the greater offense of false report of a criminal act is another matter. For the reasons expressed below, I dissent from the majority's conclusion affirming Bynum's conviction of the more serious crime.

### I. Historical Context of False-Crime Reports.

### A. The Notorious False-Crime-Reporting Case of *Rex v. Manley*.

The starting point in analysis of modern criminal liability for false reports is the English case of *Rex v. Manley*, [1933] 1 KB 529 (C.C.A.). In *Manley*, a woman falsely reported that she had been robbed. *Id.* at 529. Her report resulted in a futile search for a fictitious robber and innocent persons were investigated as a result. *Id.* The English court was offended by Manley's action, but there was no statute prohibiting her conduct. *Id.* at 534. Nonetheless, the English judges declared that the defendant was guilty of the offense of "public mischief." *Id.* at 534–35.

As noted by Professor Wayne LaFave, the *Manley* decision "caused quite an uproar in legal circles in England in the 1930's." 1 Wayne R. LaFave, *Substantive Criminal Law* § 2.1(b), Westlaw SUBCRL (3d ed. database updated Oct. 2019). The commentary in England was unfavorable. *See* R.M. Jackson, *Common Law Misdemeanors*, 6 Cambridge L.J. 193, 198–201 (1937); W.T.S. Stallybrass, *Public Mischief*, 49 L.Q. Rev. 183, 183–87 (1933). Similarly, a contemporaneous American authority cited *Manley* as violating the doctrine that a penalty cannot be imposed without express authorization in law, or *nulla poena sine lege*, a

doctrine that stands as a bulwark against the spread of authoritarianism. Jerome Hall, *Nulla Poena Sine Lege*, 47 Yale L.J. 165, 179 (1937).

More recently, Professor John Jeffries canvassed the problems with *Manley*. John Calvin Jeffries Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 Va. L. Rev. 189, 224–26 (1985). Professor Jeffries attacked the open-ended nature of common law creation of criminal offenses, viewing *Manley* as a continuing invitation to law enforcement "to vindicate their own notions of appropriate social control by criminal arrest and prosecution." *Id.* at 226.

The *Manley* case is likely to be the last example of common law development of criminal law in England. As noted more recently by Lord Bingham, "There are . . . powerful reasons of political accountability, regularity and legal certainty for saying that the power to create crimes should now be regarded as reserved exclusively to Parliament, by statute." *R. v. Jones*, [2006] UKHL 16, [23], [2007] 1 AC 136 (appeal taken from EWCA).

In Iowa, we long ago abandoned the notion of common law crimes. *Estes v. Carter*, 10 Iowa 400, 401 (1860). ("Whilst, therefore, the principles of the common law do enter into all our criminal adjudications when the jurisdiction of our courts over criminal offenses has been established by law, still they do not confer upon the courts in this State the power to try and punish an offense that is such at common law, but which has not been ordained as such by the supreme law making power of the State."). But the lesson arising from *Manley* remains powerful today. Courts do not have the province or authority to extend or create crimes in the name of public policy.

### B.  Legislative Responses to *Manley*.

1. *Introduction.*  In light of the perceived need to address the issue of false reporting but the overwhelmingly negative response to *Manley*, a number of proposals for legislative action arose.  The Model Penal Code, with drafting beginning in 1951 and promulgation following in 1962, was the first modern concerted effort to comprehensively address legal issues like false reporting in *Manley*.  Paul H. Robinson & Markus D. Dubber, *The American Model Penal Code: A Brief Overview*, 10 New Crim. L. Rev. 319, 320–25 (2007) (outlining the context of the Model Penal Code and previous attempts to create cohesive model codes).  Indeed, it has been observed that "[w]hen the Model Penal Code project was launched . . . the vast majority of American criminal codes were in a sorry state." *Id.* at 322. A number of states followed by enacting a wide variety of state statutes adopting the Model Penal Code, in whole or in part, including provisions criminalizing false reports.  *Id.* at 326.  An examination of the Model Penal Code and other state legislation sets the framework for consideration of Iowa Code section 718.6.

2. *Model Penal Code.*  The Model Penal Code included section 241.5, a provision related to false reports.  Section 241.5 provides,

> (1) **Falsely Incriminating Another.**  A person who knowingly gives false information to any law enforcement officer with purpose to implicate another commits a misdemeanor.

> (2) **Fictitious Reports.**  A person commits a petty misdemeanor if he:

>> (a) reports to law enforcement authorities an offense or other incident within their concern knowing that it did not occur; or

>> (b) pretends to furnish such authorities with information relating to an offense or incident when he knows he has no information relating to such offense or incident.

Model Penal Code § 241.5, 10A U.L.A. 631 (2001). Notably, under the Model Penal Code, false incrimination arises when a person knowingly gives false information "to implicate another." *Id.* And, a fictitious report may arise not only from a false report related to "an offense" but also more broadly to a false report related to an "incident." *Id.* Plainly, under the Model Penal Code, a crime or criminal act is not required.

3. *False-report legislation in other states.* A number of states have enacted false-report statutes. In general, there are two approaches to false-report statutes. Some false-report statutes, like the Model Penal Code, do not require false report of a criminal act to establish liability. For example, Pennsylvania's statute provides that a misdemeanor in the third degree arises when a person "pretends to furnish [law enforcement] with information relating to an offense or incident when he knows he has no information relating to such offense of incident." 18 Pa. Stat. & Cons. Stat. Ann. § 4906(b)(2) (West, Westlaw current through 2019 Reg. Sess. Act 91). Similarly, Tennessee makes it unlawful to falsely "[i]nitiate a report or statement to a law enforcement officer concerning an offense or incident." Tenn. Code Ann. § 39-16-502(a)(1) (West, Westlaw current through 2019 1st Extraordinary Sess.). Following the pattern, the South Dakota false-reporting statute provides that a person who falsely reports a crime "or other incident within [the] official concern [of law enforcement]" is guilty of the offense. S.D. Codified Laws § 22-11-9 (Westlaw current through 2019 Sess. Laws). The false-reporting statute in Hawai'i provides for criminal liability for a false report to law enforcement agencies related to "a crime or other incident within their concern." Haw. Rev. Stat. Ann. § 710-1015 (West, Westlaw current through Act 286 of the 2019 Reg. Sess.).

These false-reporting statutes, like the Model Penal Code, are broadly framed and do not require the commission of a crime. Under these

statutes, it is enough to provide information to authorities that leads officers to *suspect* a third party has committed a crime or cause police to investigate. *Commonwealth v. Soto*, 650 A.2d 108, 110 (Pa. Super. 1994) (noting defendant was not guilty of false reporting since statement did not lead officers to suspect third party had committed crime); *State v. Smith*, 436 S.W.3d 751, 773 (Tenn. 2014) (finding defendant's false statements that wife went shopping with substantial amounts of cash was sufficient to constitute false reporting under statute).

On the other hand, other false-claim statutes are more narrowly drawn and require a false report of a crime or criminal act to give rise to the crime. For example, in Arkansas, the crime of filing a false report arises when a person files a false report with law enforcement of "any alleged criminal wrongdoing." Ark. Code Ann. § 5-54-122(b) (West, Westlaw current through 2019 Reg. Sess.). Similarly, Michigan law provides for the crime of false reporting when the person makes "a false report of the commission of a crime." Mich. Comp. Laws Ann. § 750.411a(1) (West, Westlaw current through P.A.2019, No. 146, of the 2019 Reg. Sess.). Ordinarily, a report of criminal activity means a report of a crime. *See, e.g.*, *Boveia v. State*, 228 S.W.3d 550, 554 (Ark. Ct. App. 2006) ("In addition, there are no Arkansas cases clearly defining 'criminal activity,' although the language from several cases suggests that 'criminal activity' is a criminal act as defined by statute.").

A number of states have enacted false-reporting civil statutes permitting the government to recover expenses related to official responses to false reports. By way of example, California law provides that a person who makes a false report that "proximately causes an appropriate emergency response by a public agency[] is liable for the expense of the

emergency response." Cal. Gov't Code § 53153.5 (West, Westlaw current through ch. 870 of 2019 Reg. Sess.).

Similarly, Arizona law provides that a person convicted of the crime of false reporting and the false report "results in an emergency response or investigation . . . is liable for the expenses that are incurred incident to the emergency response or the investigation." Ariz. Rev. Stat. Ann. § 13-2907(B) (Westlaw current through 2019 1st Reg. Sess.). In Michigan, if a person is found guilty of the crime of false reporting,

> the court may order the person convicted to reimburse the state or a local unit of government for expenses incurred in relation to that incident including, but not limited to, expenses for an emergency response and expenses for prosecuting the person.

Mich. Comp. Laws Ann. § 769.1f(1) (West, Westlaw current through P.A.2019, No. 146, of the 2019 Reg. Sess.). Under false-reporting civil statutes that permit the government to recover expenses, the government must show the nature of its response to the false report. Ordinarily, however, the crime of false reporting, under both statutes that require a criminal act and those that don't, do not require the government to make any showing of the nature of its response.

**II. Application of Iowa's False-Reporting Statute.**

**A. The Text of the Iowa Statute.** Iowa's false-reporting statute provides that

> [a] person who reports or causes to be reported false information to a fire department, a law enforcement authority, or other public safety entity, knowing that the information is false, or who reports the alleged occurrence of a criminal act knowing the act did not occur, commits a simple misdemeanor, unless the alleged criminal act reported is a serious or aggravated misdemeanor or felony, in which case the person commits a serious misdemeanor.

Iowa Code § 718.6(1).

As is apparent, the Iowa statute distinguishes between a report with "false information" and a report of "the alleged occurrence of a criminal act." If the "alleged criminal act reported" is a serious or aggravated misdemeanor or felony, the crime is a serious misdemeanor; otherwise, false reporting is a simple misdemeanor. In short, Iowa has incorporated into its statute two types of false-reporting crimes: one broadly triggered by "false information" and another narrowly triggered by a false report of "a criminal act," which, under certain circumstances, can lead to an enhanced criminal penalty.

**B. Application of Iowa's False-Reporting Statute to the Facts of This Case.** There is no dispute that Bynum violated Iowa Code section 718.6(1) by providing false information to law enforcement. But the question in this case is not whether he made a false report to law enforcement. He obviously did. The question is whether he reported a "criminal act" that was a serious or aggravated misdemeanor or felony, thereby leading to an enhanced criminal penalty under the statute.

It seems to me that while Bynum reported that persons were carrying firearms in public and that such a report *implicated* the parties in a potential crime, it was not the report of a "criminal act" but rather the report of facts that, if investigated, *might* show a criminal act. Iowa Code section 724.4(1) outlines the crime of going armed with a dangerous weapon. The prefatory words are "[e]xcept as otherwise provided in this section, a person who goes armed with a dangerous weapon" commits a crime. *Id.* One of those exceptions is possession of a valid permit. *Id.* § 724.4(4)(*i*).

The persons who Bynum falsely claimed were at large reportedly carried guns, but that could be perfectly legal under Iowa law if they had

the required permit. Merely reporting that someone is carrying a gun in public is not the report of a crime, only a *potential* crime.

Some might say this is hairsplitting, but I think it is the result of careful and correct interpretation of the words employed in the statute by the legislature and its two-tiered classification system. It is not our province to rewrite the statute. The broad approach to false reporting, as demonstrated by the Model Penal Code and the Pennsylvania, Tennessee, South Dakota, and Hawai'i statutes is embraced in the first part of Iowa Code section 718.6. The legislature, however, chose to use different and narrower language requiring a false report of "a criminal act" for the enhanced false-reporting crime. In construing the scope of a criminal statute, words matter. *See Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995) (finding that judicial interpretation of statutory language is based upon what the legislature actually said rather than on what it might have said); *State v. Brustkern*, 170 N.W.2d 389, 392 (Iowa 1969) ("We do not inquire what the legislature meant. We ask only what the statute means." (quoting *In re Wiley's Guardianship*, 239 Iowa 1225, 1232, 34 N.W.2d 593, 596 (1948))).

No doubt there is plenty of reason to disapprove of Bynum's conduct. Certainly the false report resulted in a misuse of police resources. But the nature of the police response has nothing at all to do with whether the statute has been violated. The enhanced crime is false reporting of a criminal act not false reporting of an incident with criminal implications. And the nature of the police response to the false report, which may be relevant in a statutory framework that authorizes recovery of expenses, is wholly irrelevant under Iowa Code section 718.6(1).

The overbroad approach to the statute utilized by authorities below is illustrated by the admission of photographic exhibits of a handgun and

AR-15 rifle offered into evidence at trial. These photographs have nothing to do with the elements of the statute. Instead, their sole purpose was to inflame the jury. I reject the trial court's contention that such exhibits would not be prejudicial "because we see guns all the time on TV and photographs." The photographs are indeed prejudicial and should have been excluded.

In this case, the relief sought by Bynum is reversal on the ground that his requested jury instruction, which would have informed the jury that a person does not commit a crime if he or she has a valid permit when carrying a gun, should have been given. Under the proposed instruction, the jury would have had to consider whether Bynum made a false report of a criminal act in a context which included the fact that if the persons were carrying with a permit, no criminal act would occur. Instead, we have a case in which the defendant is charged with falsely reporting a "criminal act" but the full definition of that "criminal act" is not provided to the jury.

No one doubts that the instruction sought by Bynum was a correct statement of law. And no one doubts that carrying a weapon as reported by Bynum might, or might not be, a crime. But by limiting the instructions, the district court in effect ruled that, as a matter of law, a false report of what *might* be a criminal act, is "close enough for government work" under the statute to qualify for enhanced punishment. This approach is consistent with *Manley*, perhaps, but not our ordinary approach to criminal liability.

The majority confuses matters by turning this false-reporting case into a trial on the merits of the hypothetical person reported by Bynum on the possession charge. In such a trial, whether the defendant had a permit might well be an affirmative defense. But that is not the posture of this case. This is not a trial on the charge of the crime of illegal possession of

a weapon. It is a trial on the charge of falsely reporting a criminal act. Was the hypothetical person reported by Bynum committing the crime of possession? Maybe, but maybe not. The jury was entitled to an accurate instruction on exactly what crime Bynum allegedly falsely reported and may well have decided that the report of a person carrying a weapon, without more, was too ambiguous to support the enhanced charge. In my view, it was error not to give the requested instruction.

### III. Conclusion.

For the above reasons, I would reverse the conviction and remand the case to the district court.

Wiggins, C.J., joins this dissent.